# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-KA-01528-SCT

*KANYNNE JAMOL BUSH a/k/a JAMOL KANYNNE BUSH*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/18/2002 |
| TRIAL JUDGE: | HON. KOSTA N. VLAHOS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JAMES (JAY) R. FOSTER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: W. DANIEL HINCHCLIFF |
| DISTRICT ATTORNEY: | CONO CARANNA |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/10/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., GRAVES AND DICKINSON, JJ.**

**WALLER, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     A Harrison County Circuit Court jury unanimously convicted Kanynne Jamol Bush of capital murder with the underlying felony being armed robbery. The trial court subsequently sentenced Bush to life in prison without probation or parole. Bush now appeals the conviction which we affirm.

## FACTS

¶2.     On the night of December 9, 1999, Russell Stone went to the EZ Serve in Gulfport, Mississippi to see his girlfriend, Brenda Kliensmith, a cashier.     That night, Kliensmith received a phone call from a female who identified herself as Monica.     Kliensmith recognized the voice of Monica, an employee at EZ Serve, and upon request, told her what time she was getting off and that she was working by herself that night.

¶3.     Around 9 p.m., a male and female, masked and wearing black, burst into the store.     The male jumped the counter and put his gun to Kliensmith's head.     He then pointed the gun at Stone, approached him, and ordered him and Kleinsmith to get on the floor.     When Kliensmith and Stone did not immediately lie down, the assailant asked Stone, "Do you think I'm playing, b****?" and then shot him.     Stone fell to the floor, moaning loudly for several minutes.

¶4.     Kliensmith got on the floor, told the gunman she was pregnant, and begged that he not kill her.     The assailant left, and Kliensmith called 911, frantically trying to explain what had happened.     The police and ambulance arrived and took Stone to the hospital.     He subsequently died as a result of his injury.     In March of 2000, the Grand Jury in Harrison County indicted Jamol Bush, Monica Towner, Narquita Watson, and Erica Riley for the murder of Stone and armed robbery of the EZ Serve.     However, before Bush could be arrested, he left Gulfport and went into hiding.

¶5.     In October of 2000, police in Avon Park, Florida were investigating an in-state robbery and received a tip from Bush's girlfriend that "Reshard Bush," her boyfriend, had been involved in the robbery.     After investigating Bush's identity at his place of work and running a search in the National Crime Information Center's database, Officers John Robinson and Michael Rowan

discovered that the name "Reshard" was an alias. The computer search revealed that police in Mississippi had issued an arrest warrant for Jamol Bush in connection with Stone's murder. The officers called the Gulfport police and got a description of the circumstances surrounding the warrant. The officers then located Bush, followed the car in which he was riding, and took him into custody.

¶6. The officers met with Bush at the criminal investigations unit and developed a rapport with him over the course of an hour. Robinson testified that Bush eventually discussed the Florida robbery and also gave an unrecorded description of murdering Stone in Gulfport. Robinson said Bush told him about a variety of details surrounding the murder, including: (1) There was a cooperative, pregnant, female clerk in the store that night and an uncooperative white male; (2) Bush panicked and shot the male when he failed to obey Bush's orders; (3) Three black females, one of whom used to work at EZ serve, were cohorts in committing the crime; and (4) They intended to rob the store's safe of $40,000.00.

¶7. Robinson further testified, and the transcript of the conversation confirms, that when he and Rowan tried to record Bush's confession to the Mississippi crime, Bush became apprehensive and refused to cooperate. The closest Bush came to discussing the event was in this brief exchange between the officers and him:

> DET. ROBINSON: Okay. So, everything you've told us so far about the incident in Mississippi is fairly accurate? Ah, I know we didn't get into every detail of it, you just kinda gave us a general idea what went down.
>
> MR. BUSH: Yeah, I was thinking 'bout the, the ah, incident here -
>
> * * *

3

DET. ROBINSON: Okay.  Is there anything that you think about it?  Take your time.  Is there anything that you would like to get on the record about that?  On the taped interview?

MR. BUSH: (Unintelligible) Man, I wasn't, I wasn't the one who pulled the trigger.  I may have, you know what I'm saying, the reason I was (unintelligible) the situation was or what occurred or what have you (inaudible).

DET. ROBINSON: Right.  But -

MR. BUSH: (Unintelligible) There's nothing I wish to say about it.

In the hearing on his Motion to Suppress the inculpating statements, Bush said he never said anything to the officers about a Gulfport incident.

¶8.    At trial, Kliensmith testified that although she did not recognize the assailant when she first saw him in the store, she had noticed a "slit" above his left eye.  She also testified that she told the police that he might have had a gold tooth and she thought he was either five foot, ten inches or six feet tall.[1]  Although Bush is six feet tall, he does not have a scratch or scar above his left eye, nor does he have a gold tooth.  At trial, however, Kliensmith identified Bush as the man who killed Stone, testifying that she recognized him, because she had looked at him "right in his eyes" that night.

¶9.    Erica Riley, an admitted participant in the robbery, testified against Bush at his trial.  Riley stated that she, Towner, and Watson had discussed the possibility of "hit[ting] the lick" (i.e. "robbing somebody").  After going down the street to ask Bush if he was interested, he told her "it was all good" and agreed to participate.  She testified that Bush and Towner were the ones who went into the store while she and Watson, who was driving the car, waited

---

[1]A police officer who questioned Kliensmith stated that she had not mentioned a gold tooth to him.

4

outside. After they heard the gunshot, Watson drove off and then returned to the EZ Serve where Bush and Towner got in. At that point, Riley testified that Bush demanded Watson drive away from the convenience store, insisting that someone inside had been shot in the leg. She also testified that about three days later she heard him discussing the need to get rid of both the clothes he wore in the robbery and his gun. Although she did not see him dispose of the gun, she said she saw him take the clothes and put them in the garbage.

¶10. On October 17, 2002, a Harrison County Circuit Court jury convicted Bush of capital murder with the underlying felony being armed robbery, but was unable to agree on a sentence. Therefore, the trial court sentenced Bush to life in prison without probation or parole. Bush requests that we reverse and remand the case for a new trial.

**ANALYSIS**

¶11. Bush raises five grounds of reversible error: improper denial of Bush's Motion to Suppress the inculpatory statements Bush made to the Florida officers; failure by the State to present sufficient evidence to support a jury finding that Bush committed armed robbery; violation of Bush's constitutional right to confrontation; improper admission of evidence of Bush's prior convictions; and improper comments about Bush by the prosecution. *1. Motion to Suppress*

¶12. Bush argues, for the first time on appeal, that his confession to the crime was "not the result of [his] free and rational choice." He then cites to case law governing improperly admitted confessions. However, Bush's argument at trial wholly undermines his argument. At the hearing on the Motion to Suppress the inculpatory statements, the trial judge asked Bush's attorney why he wanted the statements suppressed. The attorney responded,

5

MR. RAFFERTY: Judge, based on the information and belief and the evidence that we have been provided, the defense believes that the State is going to offer into evidence, either through a recording, transcript, or the live testimony of officers, some inculpatory statements and admissions by my client. For the record, [j]udge, *I don't believe it's per se a confession in Mississippi*, however, there is [sic] some statements and admissions that can be used to incriminate an individual from our defense prospective [sic]. We then, Your Honor, believe those statements were improperly gathered . . .

THE COURT: You think they were improperly gathered because he wasn't advised of his rights?

MR. RAFFERTY: Judge, I believe that that's going to be an issue. I believe that there's going to be evidence that he was advised of some rights. *I think the question is going to be whether or not they actually conform to the* **Miranda** *decision* that then follows Mississippi law. *Also, Your Honor, my client was arrested without a warrant* . . . He was then taken into custody, allegedly given some rights, and then he made a statement allegedly to the police.

(emphasis added). When asked at the hearing on the Motion to Suppress whether he had made any of the alleged statements to the officers about the Gulfport murder, Bush unequivocally told the court that he had said nothing at all to the police about the incident.

¶13. We first note that an appellant is not entitled to raise new issues on appeal that he has not first presented to the trial court for determination. ***Dunn v. State****,* 693 So. 2d 1333, 1339 (Miss. 1997). Bush argued before the trial court that any statements made to the officers during their interview with him were inadmissible because of the failure to comply with *Miranda* and because a warrant for Bush's arrest had not been issued. Bush's attorney explicitly stated that Bush had not confessed to the murder, and Bush told the court he had not even spoken to the officers about the murder. Now he argues that although he spoke to the officers, the resultant confession was illegally obtained.

6

¶14. In using his now-acknowledged confession to the murder as a basis for his legal argument, Bush essentially admits that he lied to the trial court when he said he never made a statement to the officers regarding the murder. Bush may not argue one defense in a motion to supress and then, on appeal, use a completely different defense to cite the trial court for error. His change of course, rather than demonstrating error by the trial court, simply reveals that the claims he made in the hearing on his Motion to Suppress were largely founded on a lie. This argument has no merit.

### 2. Sufficiency and Weight of the Evidence

¶15. In order to establish that Bush committed armed robbery, the underlying felony at issue in this case, the State was required to prove: (1) a felonious taking or attempt to take, (2) from the person or from the presence, (3) the personal property of another, (4) against his will, (5) by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon. Miss. Code Ann. § 97-3-79 (Rev. 2000). Bush challenges his conviction for capital murder, erroneously combining his arguments regarding the legal sufficiency of the evidence with his arguments regarding the overwhelming weight of the evidence. We address them separately and demonstrate the clear difference between these issues.

### a. Sufficiency of the Evidence

¶16. In *Carr v. State*, 208 So. 2d 886, 889 (Miss. 1968), we stated that in considering whether the evidence is sufficient to sustain a conviction in the face of a motion for directed verdict or for judgment notwithstanding the verdict, the critical inquiry is whether the evidence shows "beyond a reasonable doubt that accused committed the act charged, and that he did so

7

under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction." However, this inquiry does not require a court to

> 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)(citations omitted)(emphasis in original). Should the facts and inferences considered in a challenge to the sufficiency of the evidence "point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty," the proper remedy is for the appellate court to reverse and render. *Edwards v. State*, 469 So. 2d 68, 70 (Miss. 1985) (citing *May v. State*, 460 So. 2d 778, 781 (Miss. 1984); *see also Dycus v. State*, 875 So. 2d 140, 164 (Miss. 2004). However, if a review of the evidence reveals that it is of such quality and weight that, "having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense," the evidence will be deemed to have been sufficient. *Edwards*, 469 So. 2d at 70; *see also Gibby v. State*, 744 So. 2d 244, 245 (Miss. 1999).

¶17. Considering the evidence in the light most favorable to the State, we find that there was sufficient evidence to convict Bush of capital murder with the underlying felony being armed robbery. Bush both confessed to and described the murder, giving the officers details about the incident, including the fact that the purpose of the robbery attempt was to rob the store's

8

safe (a felonious attempt to take the personal property), that Kliensmith was pregnant (from a person or from the presence), and that he shot Stone after he refused to get on the floor (against his will and by violence to his person), and that three females worked with him in committing the crime. His description matched the accounts of both Kliensmith, who personally suffered through the ordeal, and Riley, who helped plan the robbery. Furthermore, to the degree possible (in light of the quality and length of the videotape), the testimonies of Bush and the other witnesses matched up with the evidence in the surveillance tape. In light of these facts, we find that any rational juror could have found beyond a reasonable doubt that all of the elements had been met by the State in proving capital murder with the underlying felony being armed robbery. This issue is without merit.

### b. Weight of the Evidence

¶18. When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997). We have stated that on a motion for new trial,

> the court sits as a thirteenth juror. The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.

*Amiker v. Drugs For Less, Inc.*, 796 So. 2d 942, 947 (Miss. 2000).[2]  However, the evidence

should be weighed in the light most favorable to the verdict.  *Herring*, 691 So. 2d at 957.  A

reversal on the grounds that the verdict was against the overwhelming weight of the evidence,

"unlike a reversal based on insufficient evidence, does not mean that acquittal was the only

proper verdict."  *McQueen v. State*, 423 So. 2d 800, 803 (Miss. 1982).  Rather, as the

"thirteenth juror," the court simply disagrees with the jury's resolution of the conflicting

testimony.  *Id.*  This difference of opinion does not signify acquittal any more than a

disagreement among the jurors themselves.  *Id.*  Instead, the proper remedy is to grant a new

trial.[3]

_____

[2]We note that we have specifically disclaimed any role as the "thirteenth juror" in the context of granting a new trial on the issue of damages, *Patterson v. Liberty Assocs., L.P.*, 2004 WL 2823078, at *8, (¶ 24) (Miss. 2004), as well as when we review a motion for judgment notwithstanding the verdict,  *Allen v. Mac Tools, Inc.*, 671 So. 2d 636, 646 (Miss. 1996).  However, when the trial court (and subsequently the appellate court) reviews a verdict that is alleged to be against the overwhelming weight of the evidence, this presents a distinctive situation which necessitates the court sitting as a "thirteenth juror."  *See Amiker*, 796 So. 2d at 947.

[3]We recognize that today's articulation of the standards of review for sufficiency of the evidence and weight of the evidence, although in line with United States Supreme Court precedent as well as our own, differs from the tests articulated in some of our previous opinions.  *See, e.g. White v. State*, 732 So. 2d 961, 965-66 (Miss. 1999)(commingling distinctions between standards for weight and sufficiency of evidence); *Turner v. State*, 726 So. 2d 117, 124-25 (Miss. 1998)(misstating requirements of standard of review for weight of evidence challenge); *Thornhill v. State*, 561 So. 2d 1025, 1030 (Miss. 1989)(stating that in reviewing challenge to weight of evidence "court must accept as true the evidence which supports the verdict"); *Wetz v. State*, 503 So. 2d 803, 812 (Miss. 1987)(misstating requirements of standard of review for weight of evidence challenge); *Watts v. State*, 818 So. 2d 1207, 1213 (Miss. Ct. App. 2002)(citing to *White*).  However, we find that the opinions to which we cite in the body of our opinion today articulate the standards of review much more cogently than the previously cited opinions which contain cryptic and incongruous explanations of the standards.  For example, in *Turner*, 726 So. 2d at 125, although we stated the correct standard of review for legal sufficiency, we erroneously stated that when reviewing the weight

¶19.   Sitting as a limited "thirteenth juror" in this case, we cannot view the evidence in the light most favorable to the verdict and say that an unconscionable injustice resulted from this jury's rendering of a  guilty verdict.  It is true that, contrary to Kliensmith's recollection, Bush does not have a scratch or scar above his left eye, nor does he have a gold tooth.  Furthermore, Bush's face is not identifiable in the video, and he denies confessing to Avon City Police that he committed the crime.  Were this conflicting evidence the only substantive proof the State presented to the jury, perhaps Bush's argument for a new trial would have merit.  However, as noted above, Bush's purported confession and detailed description of the crime consequently match both the graphic accounts of eyewitnesses Kliensmith and Riley as well as the video recording of the incident.  Viewed in the light most favorable to the verdict, we cannot say that the evidence preponderates heavily against the jury's decision to find Bush guilty of capital murder.  The trial court therefore did not abuse its discretion in denying a new trial, and this issue is without merit.

### 3. Right of Confrontation

¶20.   Bush next argues that Riley's testimony regarding anything Monica Towner may have said violated Bush's Sixth Amendment right to confrontation.  However, the trial court held that under Mississippi Rule of Evidence 801(d)(2)(E) (2004), Riley's recollections of Towner's statements were admissible non-hearsay statements of a co-conspirator.  Rule 801(d)(2)(E) dictates that "[a] statement is not hearsay if . . . [t]he statement is offered against

---

of the evidence, "the Court must accept as true the evidence which supports the verdict," the Court "must accept as true the evidence favorable to the State," and "[w]here there is conflicting testimony, the jury is the judge of the credibility of the witnesses."

a party and is . . . a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."

¶21. The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. A corresponding right is secured by our state constitution which provides: "In all criminal prosecutions the accused shall have a right . . . to be confronted by the witnesses against him[.]" Miss. Const. art. 3, § 26 (1890). In *Mitchell v. State*, 495 So. 2d 5, 8-10 (Miss. 1986), Justice Robertson, speaking for the Court, cogently set out the history and development of our Confrontation Clause law with respect to the statements of co-conspirators. Considering the constitutional implications of allowing in such statements, we noted that "[n]on-confronted out-of-court statements are thought to lack indicia of reliability sufficient that they be considered by the trier of fact." *Id.* at 8. The problem of reliability is magnified in cases where the out-of-court declarant is an accomplice of the accused. *Id.* at 8-9. Even so, the "presumption of unreliability ordinarily attached to a co-defendant's statement may nonetheless be rebutted so as to meet confrontation clause standards if it is supported by a showing of particularized guarantees of trustworthiness." *Id.* at 9 (citing *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980), *overruled on other grounds*, *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)). Despite the federal and state confrontation clauses and hearsay rules, "[c]o-conspirators' statements made in the course of and in the furtherance of the conspiracy are admissible against each other." *Id.* at 11. As long as "the 'in the course of' and 'in the furtherance of' conditions are met, the necessary indicia of trustworthiness are thought present." *Id.*

12

¶22.    Our holding in *Mitchell* is unaffected by the United States Supreme Court's recent *Crawford* decision.  In *Crawford*, the Court dealt with a case in which the State offered a taped police interview of a woman whose husband was on trial for stabbing a man whom the husband claimed tried to rape his wife.  *Crawford*, 124 S.Ct. at 1357-58.  The trial court allowed the tape into evidence, finding that the wife's inculpating testimony met *Roberts*' requirement that the statements bear an "adequate 'indicia of reliability'"(i.e. the statements bore a particularized guarantee of trustworthiness.).  *Id.*    at 1358, 1359.[4]    In finding the admission violated the defendant's constitutional right to confront the witness against him, the Court abrogated its holding in *Roberts*, holding

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law - as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether.   Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.   We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'

*Id*. at 1374; *see also United States v. Saget*, 377 F.3d 223, 226 (2d Cir. 2004)(noting *Crawford* abrogated *Roberts* "with respect to prior testimonial statements by holding that such statements may never be introduced against the defendant unless he or she had an opportunity to cross-examine the declarant, regardless of whether that statement falls within a firmly rooted hearsay exception or has particularized guarantees of trustworthiness.").   Although the Court declined to "spell out a comprehensive definition of 'testimonial,'" it did make clear that

---

[4]The other "indicia of reliability" under *Roberts* (which did not apply in this case) is admission of statements which fall within a firmly rooted hearsay exception.  *Crawford*, 124 S.Ct. at 1359.

statements of co-conspirators in furtherance of a conspiracy were non-testimonial, and therefore unaffected by the holding. *Id.* at 1366-67. Consequently, *Crawford* does not apply to the facts of this case.

¶23. In his brief, Bush specifies no in-court statements attributed to Towner which were made outside of the course and in not in furtherance of the conspiracy. He instead cites three cases: *Garrison v. State*, 726 So. 2d 1144 (Miss. 1998), *Williams v. State*, 667 So. 2d 15 (Miss. 1996), and *Stoop v. State*, 531 So. 2d 1215 (Miss. 1988), for the proposition that Riley's testimony quoting Towner violated Bush's Sixth Amendment right to confrontation. However, each of these cases is wholly inapplicable to the facts at hand. First, in *Garrison*, we dealt with a case in which the trial court improperly entered the transcript of a co-defendant's guilty plea. *Garrison*, 726 So. 2d at 1146. Rule 803 was not even discussed in that case, because it was not relevant to the facts of the case. Neither was Rule 803 discussed in *Williams*, since the case dealt with the statements of the co-defendant which she made while in police custody. *Williams*, 667 So. 2d at 18. Finally, in *Stoop*, we found that the trial court inappropriately admitted the transcript testimony of a witness whom the State had not sufficiently demonstrated was unavailable to testify. *Stoop*, 531 So. 2d at 1220. This case did not even deal with Rule 803, much less the statements of co-defendants.

¶24. The three cases Bush cites are off point and provide no support for his contention that his right to confrontation under the federal and state constitutions was violated. In light of the fact that Bush cites no authority to back his claims of a Sixth Amendment violation, his claims are procedurally barred. *See Dycus v. State*, 875 So. 2d 140, 169 (Miss. 2004) ("We remain

14

steadfast to the rule that failure to cite any authority may be treated as a procedural bar, relieving us of any obligation to consider the assignment"). Nonetheless, we consider Bush's citation of error on its merits.

¶25. Riley and Townsend were co-conspirators in the plot to rob the EZ Serve. Under *Roberts*, *Crawford*, *Mitchell*, and Rule 803(d)(2)(E), any statements Townsend may have made to Riley, her co-conspirator, in the course of or in furtherance of the conspiracy have the necessary guarantee of trustworthiness we require to address our concerns about the constitutional right to confrontation under the Sixth Amendment and the protection against hearsay. Bush cites no statements attributed to Townsend which she made outside the furtherance of the conspiracy, and this issue is without merit.

### 4. Prior Convictions

#### a. On-the-record Analysis

¶26. Bush next argues that the trial court inappropriately allowed evidence of his prior convictions and failed to conduct an on-the-record balancing test before allowing the convictions into evidence. First, we note that although Bush did object to the admission of the convictions at trial, he made no objection to the trial court's on-the-record analysis of its decision to allow the convictions into evidence. He is therefore procedurally barred from raising the issue of the trial court's alleged failure to conduct an on-the-record analysis. *See Dunn*, 693 So. 2d at 1339. However, we nonetheless consider the issue on its merits.

¶27. On cross-examination, the prosecutor referred to an incident in which Bush overheard Riley openly discussing the murder and asked Bush whether he was concerned about a man being killed. Bush replied, "Of course, it's sorrowful that someone was killed. My mother was

15

killed, gunned down. I don't like, in fact, you know what I mean, guns, knives, or anything of that nature." Shortly thereafter, Bush's attorney objected when the prosecutor began a line of questioning which Bush's lawyer anticipated would lead to discussion of Bush's prior criminal acts. The judge dismissed the jury to confer with the attorneys on whether to allow the statements.

¶28. In the lengthy discussion, the trial court considered whether Bush had opened the door to having his statement impeached by prior bad acts. During the discussion, the judge also considered the time of the prior bad acts, the similarity between one of the convictions and the current charge, and the importance of preventing witnesses like Bush from "testify[ing] without fear of any accountability of what they say." The trial court then allowed the prosecution, for impeachment purposes, to question Bush about all of his prior convictions involving crimes of a violent nature.

¶29. In *Peterson v. State*, 518 So. 2d 632 (Miss. 1987), we held Mississippi Rule of Evidence 609 requires the trial court to make an on-the-record determination that the probative value of the prior conviction outweighs its prejudicial effect before admitting impeachment evidence of a party's prior conviction. *Peterson*, 518 So. 2d at 636. We listed the following factors to be considered by the trial court when weighing the probative value of the acts against their prejudicial effect:

> (1) The impeachment value of the prior crime.
> (2) The point in time of the conviction and the witness' subsequent history.
> (3) The similarity between the past crime and the charged crime.
> (4) The importance of the defendant's testimony.
> (5) The centrality of the credibility issue.

*Id.* at 637.

16

¶30.    In *Young v. State*, 731 So. 2d 1145, 1152 (Miss. 1999), we noted that although the trial court had not done a full on-the-record *Peterson* analysis, it was apparent that he had appropriately "conduct[ed] a balancing test considering at least some of the factors." Accordingly, although *Peterson* does give factors which a trial court ought to consider in determining whether to allow in evidence of prior criminal acts for the purpose of impeachment, we do not apply it so rigidly that we reject honest efforts by trial courts to carefully weigh the probative value of prior acts against their prejudicial effect for the purposes of impeachment.  In the case at hand, the trial judge considered the time of the prior bad acts, the similarity between one of the convictions and the current charge, and how allowing the prosecution to impeach Bush with his prior convictions was valuable in that it allowed the State to provide the jury with necessary information to help in its "search for the truth."  Though this trial judge did not directly address *Peterson*'s five factors, it is apparent that he, like the trial judge in *Young*, appropriately satisfied the requirements of Rule 609(a)(1) by conducting a substantive balancing test in line with the spirit of *Peterson*.  This issue is without merit.

### b. Prior Convictions as Impeachment

¶31.    We next address the issue of whether Bush opened the door of impeachment when he stated, "I don't like, in fact, you know what I mean, guns, knives, or anything of that nature." It is a well-settled point of law that "[w]here an accused, on direct examination, seeks to exculpate himself, such testimony is subject to normal impeachment via cross-examination, and this is so though it would bring out that the accused may have committed another crime." *Stewart v. State*, 596 So. 2d 851, 853 (Miss. 1992).  Normal impeachment applies when the

17

defendant makes broad statements which open the door for impeachment. *Johnson v. State*, 666 So. 2d 499, 503 (Miss. 1995)(citing *Quinn v. State*, 479 So. 2d 706, 708-09 (Miss. 1985); *Pierce v. State*, 401 So. 2d 730 (Miss. 1981)). Once the defendant or witness has opened the door to his criminal record, "the evidence used by the State in response is more like rebuttal evidence than impeachment." *Johnson*, 666 So. 2d at 503 (citing *Settles v. State*, 584 So. 2d 1260, 1264 (Miss. 1991)). However, if the State "initiates the matter by eliciting from the defendant the response it later seeks to impeach by showing the defendant's prior criminal . . . activities, the impeachment is impermissible and cause for reversal and remand." *Johnson*, 666 So. 2d at 503 (quoting *Quinn*, 479 So. 2d at 708) (alterations omitted). The impeachment evidence is admissible only for the purpose of impeaching credibility and may not be used for the purpose of establishing its truth. *Johnson*, 666 So. 2d at 503 (citing *Quinn*, 479 So.2d at 708). The State is further limited in that its "impeachment privilege may not exceed the invitation extended." *Stewart*, 596 So. 2d at 853. The application of this precedent is not confined to "door-opening" statements made on direct examination alone. In fact, we have previously stated, in our cursory review of a defendant's procedurally-barred claim of error, that evidence of a prior conviction was properly admitted where the defendant, on cross-examination, opened himself up to questioning by voluntarily attempting to explain away a prior conviction. *Gates v. State*, 484 So. 2d 1002, 1009 (Miss. 1986).

¶32. In the case at hand, Bush, on cross-examination, was asked (in regard to his reaction to Riley's public discussion of the murder and his inability to remember what she had said):

Q: You didn't care that a man had been killed?

18

A: Of course, it's sorrowful that someone was killed. My mother was killed, gunned down. I don't like, in fact, you know what I mean, guns, knives, or anything of that nature.

¶33. However, as the State demonstrated with Bush's prior criminal acts, Bush is quite comfortable with guns and "things of that nature." The State properly brought his credibility into question when it used his criminal history to demonstrate that contrary to his alleged fearful disposition towards weapons and "anything of that nature," he had previously been convicted of robbing a boy of his jacket, armed robbery, and armed kidnaping. As we aptly stated in *Quinn v. State*, 479 So. 2d 706, 708-09 (Miss. 1985):

> To be sure, every defendant brought to trial may, if he wishes, try to paint himself as being as pure as the driven snow. He may do this by testifying . . . that he has never been involved in any criminal activity anywhere. When he indulges in this tactic[,] however, it is only fair that the State should have the right to test the credibility of such assertions through the normal process of impeachment.

¶34. By voluntarily indulging in the tactic of presenting himself as man who is afraid of "guns, knives, or anything of that nature," Bush extended a conditional invitation to the State for impeachment by way of his prior convictions. The State accepted this invitation and did not exceed its scope when it properly impeached Bush's testimony so as to show the jury that Bush had not been forthright in his assertions regarding his disposition toward violence.[5] This issue is without merit.

### 5. Prosecutorial Misconduct

---

[5]Bush briefly argues that the admission of the convictions was also inappropriate because: (1) one of the crimes was almost ten years prior to the trial date, and (2) one of the crimes occurred after the date of the murder. He makes these claims without citing to any law and is therefore procedurally barred from making the arguments. *See Dycus*, 875 So. 2d at 169 ("We remain steadfast to the rule that failure to cite any authority may be treated as a procedural bar, relieving us of any obligation to consider the assignment").

19

¶35.    Bush argues that during closing arguments the trial court inappropriately allowed the State to refer to his veracity, criminal record, and danger of allowing him to live in society. He specifically objects to trial counsel's statements to the jury during the sentencing phase, in which she asked,

> Are we as a society going to condone the Jamol Bushes of the world?  Is that what we're going to do? . . . Are we going to let the Jamol Bushes continue to commit a robbery in '92, to be revoked in '93, to finally get out of jail and commit another robbery and a murder, to hide out from that and commit another armed robbery and armed kidnaping?  How many more lives is this society going to let him affect?

Bush objected, arguing it was improper for the prosecutor to ask whether "we as a society [are] going to be in the business of killing people."  The trial court overruled Bush's objection.

¶36.    First, we note that Bush did not object to the prosecution's statements regarding his veracity.   Accordingly, he is procedurally barred bringing an issue before us that he did not raise before the trial court.   *See **Dunn***, 693 So. 2d at 1339.   Nonetheless, the same analysis applies to both the prosecutor's statements regarding society's obligation to stop Bush from terrorizing anyone else and the prosecutor calling Bush's veracity into doubt.   As we have stated before, "[c]ounsel is allowed considerable latitude in the argument of cases, and is limited not only to the facts presented in evidence, but also to deductions and conclusions he [or she] may reasonably draw therefrom, and the application of the law to the facts." ***Wells v. State***, 698 So. 2d 497, 506 (Miss. 1997).   The State appropriately highlighted both the threat Bush has proven he poses to society and his apparent struggles with being completely forthright on the stand.   In doing so, the State merely appealed to the jury based on facts that

were a part of the record and the natural deductions and conclusions that the prosecution drew therefrom. This issue is without merit.

## CONCLUSION

¶37.     After a complete review of the trial record in the underlying case, we find the jury's verdict was based on sufficient evidence, that the trial court appropriately denied Bush's Motion to Suppress his confession, that Bush's Sixth Amendment right to confrontation was not violated, that evidence of Bush's prior convictions was properly admitted, and that the trial court did not err in overruling Bush's objections to prosecutorial comments during closing arguments.  Accordingly, we affirm the Harrison County Circuit Court's judgment.

¶38.     **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT, WITHOUT HOPE OF PROBATION OR PAROLE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**SMITH, C.J., COBB, J., EASLEY, CARLSON, GRAVES, DICKINSON AND RANDOLPH, JJ., CONCUR.  DIAZ, J., NOT PARTICIPATING.**