FAIR, J.,
for the Court:
¶ 1. When Karen Winters answered a knock at the door, a man forced it open and held her at gunpoint. Two or three accomplices followed and looted Winters’s apartment as she was forced to lie on the floor with a blanket over her head. The men took her television, purse, medicine bag, change jar, and two laptops, among other things.
*311 ¶ 2. Later that night, and only a few bloeks away, an officer of the Columbus Police Department pulled over a Ford Explorer containing Demonta Gardner, five of his acquaintances, and some of Winters’s possessions. The occupants of the vehicle gave varying accounts of who had participated in the robbery and to what extent. Gardner was ultimately tried for armed robbery and burglary. He testified in his own defense that he had stayed in the vehicle and refused to rob an “old woman.” Two of his companions, however, testified for the State and placed him inside the apartment.
¶ 3. The jury acquitted Gardner of armed robbery, but it convicted of him of burglary. Gardner now appeals, arguing that the evidence does not support his conviction. We find no merit to these issues, so we affirm Gardner’s conviction and sentence.
FACTS
¶ 4. Gardner was arrested with five other young men: Michael Satterfield, Tevin Oglen, Jeremy Billups, Corey Lathan, and Bobby Bluitt. The six had varying levels of familiarity with each other and had been, by one description, classmates. Sat-terfield, Billups, and Oglen testified for the State.
¶ 5. There was some variation in the details, but the witnesses generally agreed that the group had assembled during the afternoon of September 29, 2011. Gardner was the last or one of the last to join up when the others showed up at his house. All three of the State’s witnesses agreed Gardner brought a .40-caliber pistol with him and later gave it to Oglen. Although there had been talk of visiting some girls, the six eventually decided to “hit a lick” by robbing a local drug dealer known in the record only as “Al.” Several in the group donned masks and two armed themselves with the .40-caliber pistol and a .22-caliber revolver.
¶ 6. When they arrived sometime after 10:00 in the evening, they found Al’s apartment vacant. Nearby, however, was Winters’s apartment, and through her window they could see a large flat-screen television. One of the six, either Oglen or Billups depending on the testimony,[1] wearing a hood and bandana to obscure his face, knocked on Winters’s door and claimed to be “John, from upstairs.” When Winters opened the door, the lead man forced his way inside and some of the others followed. According to Oglen and Satterfield, Gardner went inside and took the television. Billups described Gardner as going behind the building for a short time and then returning to the car; according to him, Oglen and Lathan took the television.
¶ 7. Gardner testified in his own defense. He claimed to have been surprised when the others showed up at his house, but he came along because he thought they were going to visit some girls. On the way over, however, Lathan began talking about “hitting a lick.” Gardner thought it was just bluster, but Lathan directed the driver, Bluitt, to Al’s apartment complex. Satterfield, Oglen, Billups and Lathan got out of the vehicle, but they came back after finding Al’s apartment vacant. Oglen saw the television in Winters’s apartment and suggested robbing her, but Gardner and Billups refused, even after Oglen threatened them with a pistol. According to Gardner, Oglen was the one who brought the television back. Gardner’s theory of the case was that he aban *312 doned any intent to rob or burglarize anyone by staying in the car.
¶ 8. After the robbery, the young men needed a place to store the television and other loot. Even Gardner admitted he volunteered his sister’s apartment, which was vacant. They drove there, and Satter-field went in through the window to unlock the door. They left the TV and one of the laptops in the apartment, and they disposed of some undesired items in a field nearby — pharmaceuticals, phones, and the now-empty change jar. A short time later they were apprehended.
¶ 9. Gardner was tried for robbery and burglary. The jury acquitted him of robbery, but he was convicted of burglary and sentenced to twenty years’ imprisonment and five years of post-release supervision. Gardner now appeals, contending his conviction is not supported by sufficient evidence and that it is against the overwhelming weight of the evidence.
DISCUSSION
1. Sufficiency of the Evidence
¶ 10. In his first issue, Gardner contends the evidence was insufficient to support his burglary conviction. Specifically, he argues that the evidence could only support his abandonment defense.
¶ 11. The inquiry as to sufficiency is whether the evidence shows “beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.” Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005) (citation omitted). “[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Gardner’s indictment, tracking the language of Mississippi Code Annotated section 97-17-23 (Supp.2012), alleged in relevant part that he did “break and enter the dwelling house of Karen Winters, with the intent to ... steal ... the property which was then inside.”
¶ 12. In his brief, Gardner cites to Bucklew v. State, 206 So.2d 200, 202-04 (Miss.1968) (citation omitted), where the court held:
Abandonment is a defense if the attempt to commit a crime is freely and voluntarily abandoned before the act is put in process of final execution, [and] if there is no outside cause prompting the abandonment. On the other hand, a voluntary abandonment of an attempt which has proceeded beyond mere preparation will not bar a conviction for the attempt.
¶ 13. The flaw in Gardner’s argument is that abandonment is a defense to an attempt, but there was more than sufficient evidence Gardner completed the crime, either as a principal or as an accomplice. Gardner contends that the State’s witnesses are unreliable because there are numerous discrepancies in their accounts as to who did what. Admittedly there are differences in the accounts, and each of the witnesses obviously employed the “other guy defense” to minimize the role he personally played; but all three testified that Gardner provided one of the guns used in the robbery, and Gardner admits he directed them to his sister’s apartment to hide the loot. Satterfield and Oglen testified that Gardner, working in concert with the individual who forced his way into the apartment, personally entered and took the television.
*313 ¶ 14. It has been “repeatedly held that in a criminal prosecution the jury may accept the testimony of some witnesses and reject that of others, and that they may accept in part and reject in part the evidence on behalf of the state or on behalf of the accused. In other words, the credibility of witnesses is not for the reviewing court.” Hughes v. State, 735 So.2d 238, 276-77 (¶ 177) (Miss.1999) (citation omitted). The evidence must be viewed in the light most favorable to the prosecution. Bush, 895 So.2d at 843 (¶ 16). Moreover, under the theory of accomplice liability, the jury needed to find only that Gardner aided or acted in concert with the principals. See King v. State, 47 So.3d 658, 665 (¶ 18) (Miss.2010). Given that Gardner supplied one of the guns used in the robbery and provided a place to hide the stolen items, the jury could have found Gardner guilty even if it believed he did not personally go into the apartment. We conclude there was sufficient evidence to support Gardner’s burglary conviction.
2. Weight of the Evidence
¶ 15. In his final issue, Gardner contends the verdict was against the overwhelming weight of the evidence. His argument is a retreading of his first issue, albeit with a different legal standard. A challenge to the weight of the evidence will be successful only when the verdict “is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush, 895 So.2d at 844 (¶ 18). The evidence must be viewed in the light most favorable to the verdict, and a new trial should be granted “only in exceptional eases in which the evidence preponderates heavily against the verdict.” Id. The motion for a new trial is entrusted to the trial judge, who had a first-hand view of the trial. “[Reversal] is warranted only if the trial court abused its discretion .... ” Ivy v. State, 949 So.2d 748, 753 (¶ 21) (Miss.2007).
¶ 16. Given the evidence as we have detailed it above, the verdict is not against the overwhelming weight of the evidence. This issue is without merit,
¶ 17. THE JUDGMENT OF THE CIRCUIT COURT OF LOWNDES COUNTY OF CONVICTION OF BURGLARY OF AN OCCUPIED DWELLING AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND FIVE YEARS’ POST-RELEASE SUPERVISION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LOWNDES COUNTY.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL AND JAMES, JJ., CONCUR.

. Winters described the lead man as having long hair in braids or dreadlocks, but only Lathan and Satterfield could have fit that description.